**Warren D. SCHERER, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 01-85-00565-CR.

Court of Appeals of Texas,
Houston (1st Dist.).

May 22, 1986.

Stanley G. Schneider, Houston, for appellant.

John B. Holmes, Jr., Harris County Dist. Atty., Roe Morris and Carol Davies, Harris County Asst. Dist. Attys., Houston, for appellee.

Before SAM BASS, COHEN and DUNN, JJ.

SAM BASS, Justice.

Appellant was prosecuted for murder, convicted by a jury of voluntary manslaughter, and sentenced to five years confinement, probated for five years.

We reverse and order dismissal.

Appellant, the husband of the complainant's ex-wife, testified that the complainant began threatening him after his marriage to the complainant's ex-wife. The complainant threatened to kill appellant and burn the appellant's house. Periodically,

the complainant would come to the appellant's house shouting, cursing, and beating on the door. As a result, appellant had boards placed over the windows of his house for protection.

Appellant's wife told appellant about the complainant's violence toward other people. Appellant's 18-year-old step-daughter, Crystal, also related incidents to appellant, and appellant remembered Crystal telling him of her fear of the complainant. Among the incidents related to appellant were that the complainant pistol-whipped a girlfriend, that he broke the wrist of another girlfriend, and that he beat someone on the highway with a tire tool.

Gloria, appellant's wife, testified that she was the ex-wife of the complainant, and described several beatings that she received from the complainant during her marriage to him. In one incident, the complainant kicked her in the ribs with his boots. After their divorce, the complainant came to her apartment and attempted to strangle her.

Gloria further testified that the complainant had threatened to kill her and appellant, and told her that she would never have her baby. As a result of these threats, her husband was scared of the complainant.

Crystal testified that she witnessed numerous threats by the complainant towards appellant: "Usually he would start in cussing him and then he would just let out that he was going to kill him." She believed the complainant was capable of those threats because he was a violent man.

On May 16, 1984, Crystal's employer called appellant and his wife and indicated that there was a problem with Crystal at work. Appellant and his wife picked Crystal up and took her to Baytown Hospital. Appellant's wife informed the complainant about Crystal's hospital admission. According to Crystal, the complainant arrived after her mother and stepfather's (appellant's) departure. The complainant then took Crystal to appellant's home.

When no one responded to the complainant's knock, the complainant beat on the bedroom window and threatened to kill appellant. Appellant testified that he was awakened by the beating on the window. Appellant's wife called the police. Appellant stated that he did not open the door because he was afraid the complainant "would tear (his) head off." The complainant then left with his daughter, Crystal, and went to his home.

On May 17, 1984, appellant worked until noon, then went to the hospital to check on Crystal. After discovering Crystal had left, he went to his own home. Appellant fell asleep on the living room floor with his three-year old son; he was awakened by a noise at the back door and saw the complainant walk around the corner. Appellant got up, walked around the corner into the hallway, and saw Crystal in her room taking clothes from the closet. The complainant was standing in the doorway. Appellant spoke to Crystal, and the complainant told appellant to "shut up" and called him a "son of a bitch."

The complainant then grabbed appellant by the throat and pushed him to his knees. Crystal jumped on her father (the complainant) and pulled him away. At this point, appellant testified he was "scared to death." The complainant turned to Crystal and appellant crawled into his bedroom. Appellant took the shotgun from his bedroom and walked to the door with the shotgun barrel pointed to the floor.

Appellant told Crystal to call the police and repeatedly told the complainant to leave. Instead, the complainant began cursing and threatening to kill appellant, and began advancing toward appellant, threatening to kill him. Appellant raised the barrel of the shotgun. When the complainant reached for the gun, appellant fired, and the complainant started to spin. Appellant fired two more shots and the complainant hit the ground. Appellant testified that he was in fear of his life and of his three-year-old son's life.

Appellant's testimony of the incident was partially corroborated by Crystal.

Deputy Hall, of the Harris County Sheriff's Department, testified that upon entering the living room, she observed evidence of a struggle. She heard appellant say words to the effect that he had to shoot the complainant to protect himself and his family.

Ulrich, of the Department of Public Safety, testified that an examination revealed that the three shotgun shells in evidence were fired from the same shotgun in evidence, and that in order to fire a second shot the forestock would have to be pumped before pulling the trigger. No examination had been conducted to determine firing time.

Parungoa, an Assistant Medical Examiner of Harris County, testified that he found buckshot wounds of exit on the anterior side of the chest; shotgun wounds of entrance on the left side of the abdomen; buckshot wounds of exit on the right side of the abdomen; grazing shotgun wounds on the left side of the left eye; buckshot wounds of entrance on the right forearm; and a shotgun wound of entrance on the left upper side of the back. He was of the opinion that death resulted from a close range shotgun wound of the abdomen and the back, and that the gun was fired within six feet of the deceased.

In his first ground of error, appellant alleges that the trial court erred in instructing the jury on the lesser included offense of voluntary manslaughter, in that there was no evidence of sudden passion arising from adequate cause.

Similarly, appellant's second ground of error alleges that the evidence is insufficient to support the jury's verdict because there was no evidence of sudden passion arising from adequate cause.

The trial court charged the jury on the issues of self-defense, murder, and voluntary manslaughter.

"When evidence *from any source* raises a defensive issue or raises an issue that a lesser included offense may have been committed and a jury charge on the issue is properly requested, the issue must be submitted to the jury." *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Crim.App.1978). (emphasis added).

Voluntary manslaughter differs from murder in that the actions causing the death occur under the immediate influence of sudden passion arising from an adequate cause. *Stevens v. State*, 671 S.W.2d 517, 523 (Tex.Crim.App.1984).

Tex.Penal Code Ann. 19.04 (Vernon 1974) provides in pertinent part that:

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

■ It follows that unless there is some evidence of sudden passion in the case, voluntary manslaughter cannot be considered a lesser included offense of murder. *Bradley v. State*, 688 S.W.2d 847, 851 (Tex.Crim.App.1985).

Although the evidence raises the issue, and the court charges on the law of self-defense (as it did in this cause), an objecting accused is not automatically entitled to a charge on voluntary manslaughter unless there is evidence that the killing occurred under the immediate influence of sudden passion arising from an adequate cause. *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim.App.1983); *Luck v. State*, 588 S.W.2d 371, 374 (Tex.Crim.App.1979).

Conversely, appellant correctly argues that "just because the evidence may raise

an issue of self defense does not mean that an accused must be subjected to a charge on voluntary manslaughter over objection, where the evidence does not even suggest he was overcome by a sudden passion and therefore acted while incapable of cool reflection." *Bradley v. State,* 688 S.W.2d at 852.

Appellant properly objected on the basis that the evidence did not support a voluntary manslaughter charge.

We must therefore consider whether, on the facts of this case, voluntary manslaughter should have been charged as a lesser included offense of murder.

In reviewing the sufficiency of the evidence, whether direct or circumstantial, the reviewing court must view the evidence in the light most favorable to the jury's verdict and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Burks v. State,* 693 S.W.2d 932, 937 (Tex.Crim.App.1985).

In *Daniels v. State,* it was held that a "bare claim" of fear does not demonstrate "sudden passion." Rather, fear constitutes "sudden passion" when its cause is such that would commonly produce a degree of terror "sufficient to render the mind incapable of cool reflection." *Daniels v. State,* 645 S.W.2d at 460; Tex.Penal Code Ann. § 19.04(c) (Vernon 1974). Therefore, although the accused in *Daniels* testified that when he shot the deceased he was in fear of his life, the fact that he also testified that he acted "in full control" revealed he had reflected on his action, knew what he had to do, and did it, so that there was no evidence of voluntary manslaughter. *Id.* The court cited *Hobson v. State,* 644 S.W.2d 473, 478 (Tex.Crim.App.1983), which emphasized that "sudden passion" must be directly caused by and arising out of provocation by the deceased *at the time of the offense;* passion solely the result of former provocation would not qualify.

■ Appellant repeatedly asked the deceased to leave and asked his stepdaughter to call the police prior to the shooting,

manifesting his cool reflection prior to the shooting. Only when the deceased started towards him did he raise his gun, point at the deceased and fire. When the complainant advanced towards him and threatened to kill him, appellant stated he was in fear of his life and his son's life.

The facts in *Bradley v. State,* are almost indistinguishable from those of the instant case. In *Bradley,* it was held that the element of sudden passion was not raised by the evidence, because there was no evidence that the accused "became enraged, resentful or terrified immediately prior to the shooting." *Bradley v. State,* 688 S.W.2d at 852.

The evidence presented in the instant case strongly shows that appellant acted in self-defense. It does not show that he had lost the capacity for cool reflection. Appellant told the deceased to leave; he told his stepdaughter to call the police; he displayed his shotgun. There is no evidence that appellant pointed the shotgun at the deceased, threatened the deceased, cursed, attacked, or shot the deceased until after the deceased came toward him, reaching for the shotgun.

Accordingly, we hold that there was insufficient evidence to raise the issue of voluntary manslaughter and that the charge on voluntary manslaughter was improper.

Appellant's first and second grounds of error are sustained.

We need not consider appellant's remaining ground of error.

The judgment is reversed and remanded to the trial court with instructions to enter a judgment of acquittal. *Bradley v. State,* 680 S.W.2d at 853.